THOMAS P. O'BRIEN
United States Attorney
CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division
JOSEPH O. JOHNS (SBN 144524)
Assistant United States Attorney
    1300 U.S. Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone:  (213) 894-4536/2451
    Facsimile:  (213) 894-7631
    Email: joseph.johns@usdoj.gov
JOHN C. CRUDEN
Acting Assistant Attorney General
ELINOR COLBOURN
Senior Trial Attorney
Environmental Crimes Section
Environment & Natural Resources Division
U.S. Department of Justice
    601 D. St., NW
    Washington, DC 20004
    Telephone:  (202) 305-0205
    Facsimile:  (202) 305-0397
    Email: elinor.colbourn@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR-07-00449-PSG |
|        Plaintiff, | GOVERNMENT'S POSITION |
|       v. | REGARDING SENTENCING |
| PETER X. LAM and | |
| ARTHUR YAVELBERG | Date:    May 18, 2009 |
|        Defendants. | Time:    3:00 p.m. |

Plaintiff United States of America, by and through

undersigned counsel, hereby submits its Position Regarding

Sentencing as to defendants Peter X. Lam and Arthur Yavelberg.

On October 29, 2008, a federal jury in Los Angeles,

California convicted Lam of conspiring to violate 18 U.S.C. § 545

1  (importation contrary to law) and 21 U.S.C. §§ 331(a) & (c),

2  333(a)(2) (felony misbranding), and of three counts of violating

3  18 U.S.C. § 545 (trafficking in fish imported contrary to 21

4  U.S.C. § 331(a)).  Also on October 29, 2008, a federal jury in

5  Los Angeles, California convicted Yavelberg of conspiring to

6  violate 21 U.S.C. §§ 331(a) & (c), 333(a)(1) (misdemeanor

7  misbranding).

8      Based on the facts and guidelines set forth below, the

9  Sentencing Guidelines result in a guideline calculation for Lam

10  of offense level **26**, which is calculated as follows:

11      Base offense level                          **26**
        [§ 2T3.1(a); § 2T4.1]

12
                                    TOTAL    _____
13                                            **26**

14

15      Based on the facts and guidelines set forth below, the

    Sentencing Guidelines result in a guideline calculation for
16
    Yavelberg of offense level **10**, which is calculated as follows:
17
        Base offense level                          6
18      [2N2.1(a)]

19      Adjustment for Role in the Offense           +3
        Manager or Supervisor
20      [3B1.1((b)]

21      Adjustment for Obstruction of Justice        +2
        [3C1.1]
22
                                    TOTAL    _____
23                                            **11**

24  The government believes that both defendants are in Criminal

25  History Category I.  Sentencing range at offense level 26 and

26  Criminal History Category I is 63-78 months (Zone D).  Sentencing

27  range at offense level 11 and Criminal History Category I is 8-14

28  months (Zone C).

1        The government believes that the appropriate sentence for

2    Lam, pursuant to both the Sentencing Guidelines and the factors

3    to be considered under 18 U.S.C. § 3553, is the low end of the

4    applicable guideline sentence, **63 months in prison and a fine of**

5    **$12,500.**   The government believes that the appropriate sentence

6    for Yavelberg, pursuant to both the Sentencing Guidelines and the

7    factors to be considered under 18 U.S.C. § 3553, is the high end

8    of the applicable guideline sentence, **14 months, and a fine of**

9    **$20,000.**

10       The Government's Position is based on the attached

11   Memorandum of Points and Authorities, the trial record, and the

12   files and records in this case.

13   DATED: May 5, 2009.

14                          Respectfully submitted,

15                          THOMAS P. O'BRIEN
                            United States Attorney
16
                            CHRISTINE C. EWELL
17                          Assistant United States Attorney
                            Chief, Criminal Division
18

19
                            _____/S/_____
20                          JOSEPH O. JOHNS
                            Assistant U.S. Attorney
21

22                          _____/S/_____
                            ELINOR COLBOURN
23                          Senior Trial Attorney

24                               Attorneys for Plaintiff
                                 United States of America
25

26

27

28

1        <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

2                    I.   BACKGROUND

3        Lam and Yavelberg's convictions stem from the following law

4    and evidence involving their trafficking in fish of the species

5    *Pangasius hypophthalmus*.

6    A.   LAW

7        On August 12, 2003, the U.S. Department of Commerce imposed

8    an anti-dumping duty of up to 63.88% on the imports into the

9    United States of certain frozen fish fillets from Vietnam,

10   including all species in the genus *Pangasius,* including

11   specifically *Pangasius hypophthalmus*.  As of July 1, 2004, frozen

12   fillets of the genus *Pangasius* had a unique and specific tariff

13   code of 0304206033.  There were separate tariff codes for frozen

14   fillets of  "sole," "flounder," "pike," and other "fish fillet,"

15   none of which were subject to anti-dumping duties.

16       Pursuant to 18 U.S.C. § 545, it is illegal to knowingly

17   receive or sell merchandise, including fish, knowing it to have

18   been imported or brought into the United States contrary to law.

19       Pursuant to 21 U.S.C. §§ 331(a) & (c) and 333(a)(2) it is a

20   felony violation to introduce or deliver for introduction or

21   receive in interstate commerce, with the intent to mislead or

22   defraud, any food that is misbranded.  Pursuant to 21 U.S.C.

23   §§ 331(a) & ( c) and 333(a)(1), it is a misdemeanor violation to

24   introduce or deliver for introduction or receive in interstate

25   commerce any food that is misbranded.  Misbranding includes false

26   labeling, such as labeling fish as a species other than what it

27   is.  21 U.S.C. § 343.

28

1  B.    FACTS

2       1.   Background

3       Both Lam and Yavelberg are believed to be citizens of the

4  United States[1], residing during the period of the conspiracy in

5  northern Virginia.  Lam had been in the fish business in 1998-99

6  and again since 2001 when he worked first for Seafood Connection

7  in California (trial testimony of John Le, owner of Seafood

8  Connection) and then, starting in late summer or early fall of

9  2004, for Virginia Star Seafood Corporation ("Virginia Star"), of

10  which he was the President.  Government's Trial Exhibit

11  ("Exhibit") 135 (Virginia State corporation records); *see*

12  Attachment A, testimony of Yavelberg, Transcript of Motion to

13  Suppress Hearing, December 5, 2007, at 39-40.

14       Yavelberg had been in the seafood business for at least 25

15  years before starting to work for Silver Seas Company ("Silver

16  Seas") in February 2005.  Yavelberg held the title of President

17  of Silver Seas.  Trial testimony of Yavelberg; Exhibit 166.

18       2.   Present Case

19       Virginia Star and Silver Seas, together with International

20  Sea Products Corporation ("ISP") and Blue Ocean Seafood

21  Corporation ("Blue Ocean") (collectively "the Virginia

22  corporations") were related Virginia corporations that all did

23  business out of an office located at 9485 Silver King Court,

24  Fairfax, Virginia.  The companies collectively were engaged in

25  ───────────────

26       [1] An absence of records at DHS discovered by the Probation

27  Office indicate that Lam may be a legal resident and not a

28  citizen.

1   the business of importing from Vietnam, into and through the

2   Central District of California and elsewhere, and reselling,

3   seafood consisting mostly, if not entirely, of frozen fillets of

4   *Pangasius hypophthalmus* and shrimp.

5        Nhan Huhn Dat (aka Henry) Nguyen ("Nguyen"), was the

6   President and a Director of Blue Ocean and, as of approximately

7   February 11, 2005, the Director of Silver Seas.  See Exhibits

8   132, 134.  It is undisputed that Nguyen effectively controlled

9   all four Virginia companies.  Nguyen's father was the director of

10  Cantho Animal Fishery Products Processing Export Enterprise (aka

11  Cafatex) ("Cafatex"), a seafood company located in Vietnam.

12  Nguyen and Lam, through Blue Ocean, Virginia Star and ISP, would

13  import frozen fillets of *Pangasius hypophthalmus* directly and

14  indirectly from Nguyen's father's company in Vietnam.  Once the

15  fish arrived at the freezer warehouse in the United States, it

16  was sold by any of the four Virginia companies.

17       Following imposition of the above-described anti-dumping

18  duty and the *Pangasius* tariff code, U.S. Customs records show

19  that Cafatex (assigned an anti-dumping duty of 45.55%) continued

20  to export directly to Blue Ocean shipments of frozen fillets of

21  *Pangasius* declared under the appropriate tariff code, 0304206033,

22  and on which duty was duly paid.  See Exhibit 427 (showing the

23  history of frozen fish fillets importations by the relevant

24  companies).  Also following imposition of the duty and new tariff

25  code, Customs records show that Virginia Star and ISP imported

26  shipments of frozen fillets of fish through Vietnamese export

27  companies including Anhaco, An Giang Agricultural Technology

28  Service Company, a/k/a Antesco, and Binh Dinh Import Export

1   Company (each assigned an anti-dumping duty of 63.88%).   Between

2   approximately May 2004 and March 2005, U.S. Customs records show

3   that Virginia Star and ISP imported some 11.6 million pounds

4   ($15.6 million) of frozen fish fillets labeled and declared as

5   sole, pike, flounder or freshwater fish - species for which there

6   is no anti-dumping duty.   No duty was paid on any of this fish.

7   Exhibit 424.

8       During the course of the investigation, 803 samples were

9   taken representing approximately 22 different importations of

10   fish by VS and ISP labeled as something other than *Pangasius* or

11   basa (including predominantly sole).   DNA testing resulted in a

12   positive identification as *Pangasius hypophthalmus* for

13   approximately 724 samples; the remaining samples did not result

14   in any positive identification.   Exhibits 70-89.

15       Lam was, in addition to being President of Virginia Star,

16   Virginia Star's primary salesperson.   Lam also was the owner of

17   all of the stock of ISP.   Exhibit 250.   Yavelberg, in addition to

18   being the President of Silver Seas, was the primary salesperson

19   for Silver Seas.

20       Lam and Yavelberg would fax price lists on a regular, even

21   weekly, basis to their customers and potential customers.   These

22   lists would commonly provide one set of prices for "basa" and a

23   second, lower, set of prices for "sole."   *See* Exhibit 364.

24       During the relevant 2004-2005 time period, true "basa,"

25   scientific name *Pangasius bocourti*, properly declared and on

26   which duty had been paid, was selling for approximately $2.60 per

27   pound, wholesale.   *See* trial testimony of Henry Yip, based on

28   purchases at that time from H & N Seafood; trial testimony of the

Ngos.   The Virginia corporations were offering the lower quality
*Pangasius hypophthalmus* as "basa" (properly tra or swai or
striped pangasius), according to price lists recovered during the
execution of a search warrant at the corporate offices, for
between $1.85 and $2.10 per pound, wholesale.   Exhibit 364.
Properly declared *Pangasius hypophthalmus* at this time was
selling for approximately $2.30 per pound, wholesale.

According to the trial testimony of industry experts, sole,
during the same time period, ranged upwards from approximately
$2.75 per pound.   The Virginia corporations were selling "sole"
for between $1.50 and $1.85 per pound.   In addition, Yavelberg in
particular was offering for sale and selling "grouper" for
approximately $1.55 per pound when the market price was about
$3.00.   Testimony of Guy Pizzutti; Exhibits 175, 178 (business
records of Sterling Seafood).

During the course of the conspiracy, the Virginia
corporations imported approximately 11.6 million pounds of fish
falsely labeled as something other than *Pangasius hypophthalmus*.
Taking for ease of calculation the fair market wholesale price of
*Pangasius hypophthalmus* as a conservative basis for calculating
the fair market retail value of this fish: $2.30 x 11,600,000
pounds = $26,680,000.

3.   Lam

Lam personally sold, between September 2004 and June of
2005, a total of $3,041,398.97 (black market wholesale value) of
*Pangasius hypophthalmus* labeled as "sole," "conger pike," "common
carp," "channa," or "grouper."   Attachment D, (quickbooks reports
from computers seized at the business offices at 9485 Silver King

8

Court, Fairfax, Virginia).  When customers would call to ask why the product was labeled one of these other names when they had in fact ordered "basa," Lam would variously explain that there had been a factory error, or that it was just another name for basa or that it was the scientific name for basa.  See Attachment F (a demonstrative exhibit used in closing arguments at trial (but for the column marked other which summarizes related information/testimony), summarizing, among other things, the evidence regarding the different explanations Lam would give to customers regarding the reasons for the false labeling).

One of the customers to whom Lam sold falsely labeled fish was David Wong of True World Foods, Inc.  In conjunction with the very first sale to Mr. Wong, Lam sent to Wong a telefax stating that "Here are some of name on the box, but fillet are real basa fish. . . .   Conger pike fillets.  Chana fillets."  Exhibit 237.

Lam also was aware of the names under which the fish was being imported, as he signed some of the purchase orders with the Vietnamese companies.  See Exhibit 368.  According to the trial testimony of his former employer and cousin, John Le, Lam was aware of the anti-dumping duties being imposed on *Pangasius* from Vietnam.

    4.    Yavelberg

Yavelberg personally sold, between February and June of 2005, a total of $1,778,662.80 (black market wholesale value) of *Pangasius hypophthalmus* labeled as "sole," or "grouper." Attachment E, (quickbooks reports from computers seized at the business offices at 9485 Silver King Court, Fairfax, Virginia). He recruited to work at Silver Seas as a salesperson, supervised

1   and mentored, his son, Evan Yavelberg.   Under his father's

2   tutelage, Evan also solicited sales of falsely labeled *Pangasius*

3   *hypophthalmus*.   *See* Exhibits 231-235.

4        In at least one fax seized during the execution of the

5   search warrant, Yavelberg place the name sole, but not basa or

6   fish or shrimp or grouper, in quotations marks.   This practice

7   was also followed by Evan Yavelberg who would offer one price for

8   basa and another for "Vietnamese 'sole'" in his faxes.   Evan

9   further quoted in one fax a separate price for "basa (marked

10  basa)."   *See* Exhibit 234   While this practice of placing sole in

11  quotations would seem to reflect knowledge that the fish was not,

12  in actuality, sole, Yavelberg denied this on the stand.   See

13  below for further discussion of this and another alleged

14  obstruction of justice.

15       Yavelberg subscribed to a seafood trade magazine that

16  carried several articles regarding the anti-dumping duties for

17  *Pangasius* from Vietnam.   Exhibits 479, 481, 482, 484, 485.

18  Yavelberg also testified that he traveled to Vietnam where he saw

19  *Pangasius* being processed.   However, Yavelberg denied knowledge

20  of the anti-dumping duties for *Pangasius* from Vietnam.

21       Over two months after the execution of a search warrant,

22  while Yavelberg was present, at the business office of Silver

23  Seas and the related corporations, Yavelberg continued to sell

24  fish falsely labeled as sole, as evidenced by the August 30, 2005

25  sale of $25,000 of sole, at the bargain price of $1.50 per pound,

26  to True World Foods, Inc.   *See* Government Exhibit 153.

27       Yavelberg was convicted of a lesser-included misdemeanor

28  offense of conspiring to violate 21 U.S.C. §§ 331 without intent

1 | or knowledge.

2 |      II.   SENTENCING GUIDELINES DISCUSSION

3 |      The statutory maximum for each of Lam's four felony counts

4 | is five years in prison and a fine of $250,000.

5 |      The statutory maximum for Yavelberg's misdemeanor count is

6 | one year in prison and a fine of $100,000.   16 U.S.C.

7 | § 1540(b)(1); 18 U.S.C. § 3571(b)(5).

8 | A.   GUIDELINES FOR LAM

9 |      1.   Count One - 18 U.S.C. § 371 (Felony Conspiracy)

10 |      A violation of 18 U.S.C. § 371 is sentenced pursuant to USSG

11 | § 2X1.1.  This guideline provides that the base offense level is

12 | that from the guideline for the substantive offense, plus any

13 | adjustments from such guideline for any intended offense conduct

14 | that can be established with reasonable certainty.

15 |      There are three different sentencing guidelines that are

16 | arguably applicable to the substantive offenses (that is, the two

17 | objectives of the conspiracy on which he was expressly convicted

18 | - violation of 18 U.S.C. § 545 (importation contrary to law) and

19 | 21 U.S.C. §§ 331(a) & (c), 333(a)(2) (felony misbranding)).  They

20 | are: (1) USSG § 2T3.1 (receiving or trafficking in smuggled

21 | property); (2) USSG § 2N2.1 (relating to offenses involving

22 | food); and, (3) USSG § 2Q2.1 (offenses involving fish).  Under

23 | the first two of these, which correlate directly to the two

24 | objectives of the conspiracy on which the conviction was based,

25 | the resulting adjusted offense level is **26**.  Under the latter

26 | guideline, the resulting adjusted offense level would be even

27 |

28 |

1  higher - 30.[2]  Because the two objectives of the conspiracy are

2  expressly governed by the first two guidelines, we believe either

3  or both are properly used to calculate the offense level for

4  Count One.

5           a.   USSG § 2T3.1 (18 U.S.C. § 545)

6           Violations of 18 U.S.C. § 545 (Counts Two through Four, and

7  Objective #3 of Count One) are explicitly governed by Section

8  2T3.1 of the Sentencing Guidelines (*see* Commentary, Statutory

9  Provisions, specifically listing violations of 18 U.S.C. § 545).

10  Under Section 2T3.1(a), the base offense level for these offenses

11  is determined by calculating the tax loss involved.  "For

12  purposes of this guideline, the 'tax loss' is the amount of the

13  duty."  USSG § 2T3.1(a).

14          Evidence at trial established the tax loss stemming from the

---

[2]        <u>Offenses Involving Fish, USSG § 2Q2.1</u>

Base offense level                                    6
[USSG § 2Q2.1(a)]

Specific Offense Characteristic:
Pecuniary Gain/Commercial Purpose                   +2
[USSG § 2Q2.1(b)(1)(A)]

Specific Offense Characteristic:
Fair Market Retail Value of the Fish               +22
[USSG §§ 2Q2.1(b)(3)(A); 2B1.1(b)(1)(G)]

                                       TOTAL      ___
                                                   30

This guideline usually relates to violations involving fish in a
conservation context rather than a duty avoidance context.
However, it contains an explicit cross reference to application
to violations of 18 U.S.C. § 545 involving fish and explicitly
would apply in a case involving false identification of fish
under the Lacey Act, 16 U.S.C. § 3373(d), whether or not
conservation related.

1  conspiracy over the time period in which Lam participated to be

2  $10,016,596.72.   Exhibit 427.   Cross reference to the tax table

3  at § 2T4.1 results in a base offense level of 26.

4      § 2T3.1(b)(1) calls for the addition of two offense levels

5  if the offense involved sophisticated means.   The Application

6  Notes specify that sophisticated means include conduct such as

7  the use of fictitious entities and corporate shells.   Application

8  Note 3.   The creation of the multiple corporations all working

9  out of the 9485 Silver King Court address, all incorporated by

10  different persons  but controlled primarily by Henry Nguyen,

11  appears to qualify as sophisticated means.   Lam knew of the

12  multiple corporations, knew that they were established for

13  purposes of misleading customers and others, agreed to be on

14  record as the President of at least one of the corporations and

15  the sole stockholder of another, and sold fish from at least

16  three of the corporations.   Nevertheless, the government does not

17  seek to apply this specific offense characteristic to Lam in the

18  unique fact pattern of this case.

19      The adjusted offense level pursuant to § 2T3.1 for Count One

20  is 26.

21          b.   USSG § 2N2.1 (21 U.S.C. §§ 331, 333)

22      Violations of 21 U.S.C. §§ 331, 333 (Objective #5 of Count

23  One) are explicitly governed by Section 2N2.1 of the Sentencing

24  Guidelines (see Commentary, Statutory Provisions, specifically

25  listing violations of 21 U.S.C. §§ 331, 333).   However, § 2N2.1

26  provides that for such offenses that involved fraud, as the

27  objective of this conspiracy expressly did, § 2B1.1 is to be

28  applied.

1    Under § 2B1.1(a)(2), the base offense level is **6**.

2    § 2B1.1(b)(1) calls for the addition of offense levels based

3  on the specific offense characteristic of the loss amount

4  involved.  Loss is defined as, among other things, pecuniary harm

5  that the defendant knew or, under the circumstances, reasonably

6  should have known, was a potential result of the offense.  In

7  this case, the loss is most readily calculated as the amount of

8  lost duties.  Taking the same amount of lost duties as under USSG

9  2T3.1 above, and as proven at trial, the loss value results in

10  the addition of **20** offense levels pursuant to USSG

11  § 2B1.1(b)(1)(K).

12    The adjusted offense level pursuant to § 2N2.1 for Count One

13  is **26**.

14      2.    **Counts Two Through Five - 18 U.S.C. § 545 (Trafficking
            in Illegally Imported Goods)**

15    As noted above, violations of 18 U.S.C. § 545 are explicitly

16  governed by Section 2T3.1 of the Sentencing Guidelines (*see*

17  Commentary, Statutory Provisions, specifically listing violations

18  of 18 U.S.C. § 545).  Under Section 2T3.1(a), the base offense

19  level for these offenses is determined by calculating the tax

20  loss involved.  "For purposes of this guideline, the 'tax loss'

21  is the amount of the duty."  USSG § 2T3.1(a).  Evidence at trial

22  established the tax loss was 63.88% of the declared import value

23  of the fish involved.

24    USSG § 1B1.3(a) provides that such base offense levels be

25  determined on the basis of the following:

26      (1)    (A)    all acts or omissions committed, abetted,
                     counseled, commanded, induced, procured, or

27                   willfully caused by the defendant; and

28

(B)   in the case of a jointly undertaken criminal
activity (. . . whether or not charged as a
conspiracy), all reasonably foreseeable acts and
omissions of others in furtherance of the jointly
undertaken criminal activity,

that occurred during the commission of the offense of
conviction, in preparation for that offense, or in the
course of attempting to avoid detection or
responsibility for that offense;

(2)   solely with respect to offenses of a character for
which § 3D1.2(d) would require grouping of
multiple counts, all acts and omissions described
in subdivisions (1)(A) and (1)(B) above that were
part of the same course of conduct or common
scheme or plan as the offense of conviction.

In this case, Lam was convicted of a lengthy conspiracy to
undertake virtually the same illegal activity over and over again
over a course of approximately nine months.  In addition to the
particular illegal sales reflected in the substantive counts, one
must take account of the sales set forth as overt acts in
furtherance of the conspiracy and all other acts that were part
of the same course of conduct or common scheme or plan as the
offense of conviction.  The additional transactions involved the
same suppliers, the same merchandise, the same false labeling and
the same purpose (pecuniary gain).  The resulting calculated
value of the loss resulting from these additional transactions,
for each of Counts Two through Four is, again, $10,016,596.72,
resulting under USSG 2T4.1 in a base offense level of 26.

For the reasons set forth above, the government is not
seeking any specific offense characteristic adjustments,
resulting in an offense level of **26** for each of Counts Two
through Four.

3.   <u>Grouping</u>

The four counts are appropriately grouped together under

1  USSG Part D as closely related counts.

2  **B.   GUIDELINES FOR YAVELBERG**

3      **1.   Count One - 18 U.S.C. § 371 (Misdemeanor Conspiracy)**

4      A violation of 18 U.S.C. § 371 is sentenced pursuant to USSG

5  § 2X1.1.  This guideline provides that the base offense level is

6  that from the guideline for the substantive offense, plus any

7  adjustments from such guideline for any intended offense conduct

8  that can be established with reasonable certainty.

9      Yavelberg was convicted of conspiring to violate 21 U.S.C.

10 §§ 331(a) and (c) and 333(a)(1).  The guideline for the

11 substantive offense, that is, the specific objective of this

12 conspiracy, is USSG § 2N2.1.  Because 21 U.S.C. § 331(a) does not

13 require a finding of fraud (unlike Lam's conviction for

14 conspiring to violate 21 U.S.C. §§ 331(a) and (c) and 333(a)(2)),

15 the base offense level is established pursuant to § 2N2.1(a) as

16 6.

17     **2.   Adjustments**

18     While there are no specific offense characteristics that

19 alter this offense level, there are two upward adjustments

20 appropriate; three levels for role in the offense, and two levels

21 for obstruction of justice.

22         **a.   Role in the Offense**

23     An adjustment for role in the offense is appropriate because

24 Yavelberg acted as a manager or supervisor in the criminal

25 activity of which he was convicted.  *See* USSG § 3B1.1(c).

26 Yavelberg recruited and trained his own son to participate in the

27 conspiracy, specifically to sell frozen fillets of both correctly

28 and falsely labeled *Pangasius hypophthalmus* for the company of

16

1  which Yavelberg was President - Silver Seas.  Evan Yavelberg,

2  like his father and pursuant to his father's training, sent

3  offers to customers of "sole" and of "basa (marked as basa)" [as

4  opposed to sole, grouper or other false label].  Exhibits 231-

5  235.  When Yavelberg took the initiative to recruit his son as a

6  participant in the conspiracy and thereafter supervised his son's

7  actions, even training him in how to participate in the

8  conspiracy, Yavelberg elevated himself to the role of manager or

9  supervisor (but not organizer or leader).

10      The criminal activity (the conspiracy of which he was

11  convicted) involved five or more participants or was otherwise

12  extensive.  Criminally responsible participants would include not

13  only Yavelberg, Evan Yavelberg, Silver Seas and Nguyen but also

14  Lam, Virginia Star, ISP, and all of the purchasers who conspired

15  to traffic in (introduce into or receive in interstates commerce)

16  misbranded fish, including but not limited to those actually

17  convicted in this and related cases such as David Wong, Tai Wai

18  David Chu, Henry Yip, Du Sa Ngo, and Joseph Xie.

19          b.   Obstruction of Justice

20      Yavelberg obstructed justice within the meaning of the

21  Sentencing Guidelines under § 3C1.1 in two distinct ways.  First,

22  he submitted at trial into evidence a false and altered document

23  or record.  *See* Commentary to § 3C1.1 at Application Note 4(c).

24  Specifically, he submitted Yavelberg's Exhibit 44.  This is a

25  materially and falsely altered version of the purchase order for

26  fish produced by the company that created the original document

27  and placed the order, which the government introduced as

28  Government's Exhibit 174, Bates 504073.

1    The unaltered copy of the purchase order, produced by the

2 purchasing company, reflected that the product purchases was "5/7

3 IQF Basa Fillet Lot #83039-E "sole"."  The altered copy, produced

4 by Yavelberg and seized during the execution of the search

5 warrant from the companies' business records, can clearly be seen

6 to have re-created lines around the area where these species

7 notations were eliminated, and to have only the species sole

8 written in where the word basa had appeared, along with an

9 original pen notation of the lot number, now without the

10 following word sole in quotes.

11    Yavelberg apparently claims that introducing an altered

12 document at trial is not an issue if, as here, the government

13 turned the document over in discovery.  In this case the false

14 document was among the business records seized from the Silver

15 King Court business address.  It was duly turned over in

16 discovery along with all other seized materials.  This simple act

17 of open discovery does not excuse the introduction of the

18 document at trial by defendant as a record showing that he was

19 NOT aware that the fish he was dealing in was in fact basa (as

20 the correct original version of the document showed).  Defendant

21 did NOT draw the alteration of the document to the attention of

22 the jury in the first instance, the government did.

23    Secondly, it is the government's position that Yavelberg

24 committed perjury while testifying at trial. *See* Commentary to §

25 3C1.1 at Application Note 4(b).  Yavelberg explained under oath

26 that the reason he had placed the word sole in quotes in a fax he

27 sent out (Exhibit 473) was that he would do so to be clear as to

28 the species being ordered if the customer was new.  *See*

1   Attachment G.  Upon further inquiry he said that if his notes he
2   made of sales calls, like those partially reflected in
3   Government's Exhibit 455, were reviewed, one would find similar
4   uses of quotation marks for species other than sole, including
5   basa.  In fact, with time after trial to conduct such a review of
6   all of the notes in the pads from which Government's Exhibit 455
7   was gleaned, specifically bates stamp numbers 093180-093220 and
8   093278-093324, no uses of quotation marks around species names
9   were found at all.  *See* Attachment H hereto.  Yavelberg's
10  explanation under oath of why he would put the species name sole
11  in quotes when communicating with a customer was perjury, as was
12  his claim that his notes would corroborate that lie.

13       The obvious and correct explanation of why the word sole was
14  in quotes was, of course, because Yavelberg knew that the fish
15  was not, in fact, sole.  This is corroborated by evidence that
16  was not admissible at trial because the witness passed away after
17  being interviewed, but before trial. In an interview on February
18  2, 2006, Arthur Waldman, President of Waldman Imports, Inc.,
19  stated that he initially purchased basa labeled as basa from
20  "Arthur" at Silver Seas. He thought Arthur's last name was
21  Yavelberg. Then, he received a second shipment that was marked
22  sole.  Waldman stated that when he asked Arthur about the box
23  markings, Arthur explained that the boxes were marked as sole,
24  but really contained basa. Waldman stated that while buying a
25  third shipment, Waldman asked Arthur if the boxes were marked
26  sole.  Arthur told him that they were marked as sole, but in fact
27  contained basa. See Attachment J, Investigative Report of
28  Interview of Arthur Waldman.  (Note that computer business

1  recordsfor Silver Seas, also included in Attachment J, reflect a

2  total of five transactions with Arthur Waldman's company, the

3  initial two being basa, then one marked grouper, one basa and the

4  final one listed as sole.)

5        Yavelberg apparently contends that no enhancement is

6  warranted because the Court did not make a finding at trial that

7  Yavelberg committed perjury.  No such finding is required for an

8  obstruction of justice enhancement.  In fact, quite the opposite.

9  Had Yavelberg been charged with and convicted of perjury, the

10  violation would be accounted for during the sentencing process

11  for that violation and could not ALSO be considered as a factor

12  warranting an adjustment to the guideline calculation for the

13  conspiracy conviction.  See USSG § 3C1.1, Note 7 (adjustment for

14  obstruction not applicable if the defendant is convicted of

15  perjury or obstruction).  Further, Yavelberg apparently contends

16  that the government presented in court only some of the his sales

17  notes (Exhibit 455) and thus the absence of corroborating

18  evidence within that subset of notes cannot show that such

19  evidence did not exist within the larger body of notes.  However,

20  the government does not rely upon Exhibit 455, but went back to

21  all of the documents seized from Silver King Court and all of

22  Yavelberg's sales notes included therein, Bates stamp numbers

23  093180-093220 and 093278-093324.  A review of all of Yavelberg's

24  sales notes again fails to provide ANY evidence that he ever use

25  such quotations in any other circumstance with any other species

26  of fish.

27        For both of these reasons, Yavelberg should receive a two

28  level adjustment upward for obstruction of justice.

### 3. Upward Departure

Finally, and alternatively, an upward departure is appropriate if otherwise necessary to reach the statutory maximum of twelve months for this conviction based on the monetary loss resulting from the conspiracy during the time Yavelberg was a participant. See Commentary to § 2N2.1, Application Note 3 Upward Departure Provisions, (A) monetary loss; and § 5K2.5. These losses would include the lost sales by competing companies whose product was priced higher than that of Silver Seas because either it was legally imported, or it was actually grouper or sole. Such losses were the intended consequence of the misbranding conspiracy of which Yavelberg was convicted, indeed of the entire business in which he was involved.

## B. Adjustments and Departures

No further adjustments to or departures from the offense levels calculated above are appropriate.

The government anticipates that Yavelberg may seek an adjustment for acceptance of responsibility under USSG § 3E1.1. A determination of whether a defendant has accepted responsibility is to be based primarily upon pre-trial statements and conduct. See USSG 3E1.1, Note 2. At trial, Yavelberg was asked under oath and after hearing all of the government's case in chief the key question: "You and your son were selling Basa marked sole for Henry Nguyen, weren't you?" Yavelberg answered flatly, "no." *See* Attachment G. He cannot now say, only after conviction, that in fact he was, as the jury found, selling such falsely labeled fish and be deemed to have accepted responsibility for purposes of the Sentencing Guidelines.

1    Moreover, another factor to be considered is whether the

2  defendant voluntarily terminated or withdrew from the criminal

3  conduct or associations and where he voluntarily resigned from

4  his office or position held during the commission of the offense.

5  USSG § 3E1.1, Note 1.(b) and (f).  In fact, following the

6  execution of a search warrant at the business location, Yavelberg

7  continued to work with his co-conspirators and to sell falsely

8  labeled fish, selling over $25,000 of "sole" to True World Foods,

9  Inc., for just $1.50 per pound, on August 30, 2005.  Government

10  Exhibit 153.  Once the original Virginia businesses folded

11  shortly thereafter, Yavelberg went to work with the former

12  bookkeeper and her brother as vice president of Thai Marine,

13  importing only "swai" (sometimes noting the scientific name

14  *Pangasius hypophthalmus*) from Vietnam and Thailand, and continued

15  that association until that company too folded in approximately

16  January 2009.

17    Yavelberg cannot now claim to have accepted responsibility

18  so as to avail himself of a downward adjustment.

19                    III.  18 U.S.C. § 3553 FACTORS

20    The government believes that the guidelines sentences

21  described above also reflect the factors to be considered under

22  18 U.S.C. § 3553, for reasons largely discussed above.  However,

23  in this case a number of related sentencings proceeded these and

24  are appropriately considered under 18 U.S.C. § 3553(a)(6) (the

25  need to avoid unwarranted sentence disparities among defendants

26  with similar records who have been found guilty of similar

27  conduct).  Attachment I hereto is a chart of the related

28  sentences in this matter.

The chart supports the government's position that a sentence of 12 months is appropriate for Yavelberg.  Three other defendants were convicted of misdemeanor violations: Du Sa Ngo, David Wong and Joseph Xie.

Ngo engaged in just two purchases of fish for a total purchase value of under $25,000.  He entered a guilty plea and provided substantial assistance to the government.  Ngo received 6 months home detention and a fine of $3,000.

Xie engaged in three purchases for a total value of under $15,000.  He entered a guilty plea and provided substantial assistance to the government.  Xie received 6 months probation and a fine of $3,000.

Wong engaged in seven purchases of fish for a total purchase value of $223,870.50.  He entered a guilty plea to two misdemeanor counts and had a prior fisheries misdemeanor violation.  Wong received a year and a day in prison, a year of supervised release, and a fine of $25,000.

Each of these defendants was convicted of engaging in trade in fish when, in exercise of due care they reasonably should have known that the fish had been taken, possessed, transported or sold in violation of an underlying law.

Yavelberg engaged in over 181 sales for a total value of more than $1,778,662.80.  He was convicted after a full trial of a committing a misbranding violation without intent or knowledge. The jury was not asked to decide whether, in the exercise of due care, Yavelberg reasonably should have known that the fish was illegal/falsely labeled.  Yavelberg should receive a sentence of

1  at least one year to avoid an unwarranted sentencing disparity

2  with these previously sentenced defendants.

3       Lam's Guideline sentence also is appropriate when compared

4  with other sentenced defendants in light of his multiple felony

5  convictions after trial, the length and extent of his

6  participation in the conspiracy, and the value of the fish/lost

7  duties involved.

8                            CONCLUSION

9       Thus, as set forth above, Lam should be sentenced at an

10  adjusted offense level **26** for all of his offenses of conviction

11  combined.   Yavelberg should be sentenced at an adjusted offense

12  level **11**.

13       It is the government's position that, for Lam, a sentence at

14  the low end of the guideline range, 63 months and a fine of

15  $12,500, is appropriate.   It is the government's position that,

16  for Yavelberg, a sentence at the high end of the guideline range,

17  14 months and a fine of $20,000 is appropriate.   The government

18  defers to the Probation Office as to the determination of each

19  defendant's ability to pay such fines.

20

21

22

23

24

25

26

27

28