Jeffrey H. Rutherford (State Bar No. 181695)
Crowell & Moring LLP
800 Wilshire Boulevard, Suite 500
Los Angeles, CA  90017
Telephone:  (213) 622-4750
Facsimile: (213) 622-2690
Email: jrutherford@crowell.com

L. Barrett Boss (*pro hac vice*)
Cozen O'Connor
The Army and Navy Building
1627 I Street, N.W., Suite 1100
Washington, D.C.  20006
Telephone: (202) 912-4818
Fax: (866) 413-0172
bboss@cozen.com

Attorneys for
Defendant Peter X. Lam

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> VIRGINIA STAR SEAFOOD CORPORATION, et al., <br><br> Defendants. | Case No. CR 07-449-PSG <br><br> **DEFENDANT PETER X. LAM'S REDACTED POSITION REGARDING SENTENCING** <br><br> Date:     May 18, 2009 <br> Time:     3:00 p.m. <br> Place:    Courtroom 790 <br>             Hon. Philip S. Gutierrez |

1        Defendant Peter X. Lam, by and through his counsel of record, hereby

2 submits his position regarding sentencing.[1]

3

4                             Respectfully submitted:

5

6 DATED:  May 11, 2009      CROWELL & MORING LLP

7

8                      By: _____ /s/ _____

9                             Jeffrey H. Rutherford

10                    COZEN O'CONNOR

11

12                      By: _____ /s/ _____

13                         L. Barrett Boss (*pro hac vice*)

14                    Attorneys for Defendant Peter X. Lam

15

16

17

18

19

20

21

22

23

24

25

---

26 [1]    The electronically filed version of this sentencing position paper will be redacted with respect to the name of Mr. Lam's minor son, certain personal identifiers, certain sensitive

27 personal information, and various home addresses. *See* General Order 08-02.  The defense will serve the Court, the government, and the United States Probation Office with the instant

28 unredacted version, which is being filed under seal.

# TABLE OF CONTENTS

I. Introduction and Background ...........................................................................3

II. Objections and Corrections to the Presentence Report ....................................4

III. Mr. Lam's Position Regarding Sentencing ......................................................4

    A. Mr. Lam's Personal History and Characteristics ...................................4

    B. Nature and Circumstances of the Offense ............................................8

        1. Henry Nguyen's Role.....................................................................8

        2. Mr. Nguyen's Deception of Sophisticated Individuals..............10

        3. Lack of Material Deception by Purchasers..................................10

    C. Advisory Guideline Range and Policy Statements .............................10

        1. Base Offense Level ......................................................................11

            a. Duty Rate .............................................................................11

            b. Relevant Conduct.................................................................11

            c. Duty Rate Multiplied by Relevant Conduct ........................12

        2. Downward Adjustment for Minimal Role .....................................12

        3. Downward Departures....................................................................13

    D. Avoiding Unwarranted Disparities........................................................14

    E. Reasons to Vary From the Sentencing Guidelines ...............................16

        1. The Advisory Guidelines Vastly Overstate Mr. Lam's Individual Culpability in the Scheme........................17

        2. The Advisory Guidelines are Not Based on Any Empirical Data ..........................................................................17

        3. Mr. Lam's Role as a Single Parent in Raising his Son..............20

        4. The Crimes Here Did Not Pose the Same Danger to the Community as Many Other Crimes .................................20

        5. Mr. Lam's Background as a Vietnamese Refugee .....................22

        6. The Sentences Imposed on Other Defendants Who Knowingly Sold Mislabeled Fish................................................22

F.  Home Confinement Is Sufficient But Not Greater than Necessary to Fulfill the Purposes of Sentencing.................................23

1.  Seriousness of Offense, Respect for Law, and Just Punishment...........................................................................23

2.  Deterrence ....................................................................................24

3.  Protection of Public......................................................................24

4.  Correctional Treatment ................................................................24

IV.  CONCLUSION ................................................................................24

# TABLE OF AUTHORITIES

## CASES

*Gall v. United States,*
    128 S. Ct. 586 (2007)..................................................................3, 10, 14, 23

*Kimbrough v. United States,*
    128 S.Ct. 558 (2007) ...............................................................................18, 19

*Rita v. United States,*
    551 U.S. 338 (2007) ......................................................................................18

*United States v. Cavera,*
    550 F.3d 180, (2d Cir. 2008) ..........................................................................3

*United States v. Gardellini,*
    545 F.3d 1089 (D.C. Cir. 2008) ......................................................................3

*United States v. Leon,*
    341 F.3d 928 (9th Cir. 2003) ........................................................................14

*United States v. Menyweather,*
    447 F.3d 625 (9th Cir. 2006).............................................................13, 14, 20

*United States v. Presley,*
    547 F.3d (6th Cir. 2008) ...............................................................................15

*United States v. Ruff,*
    535 F.3d 999 (9th Cir. 2008)......................................................................4, 20

*United States v. Smart,*
    518 F.3d 800 (10th Cir. 2008)......................................................................15

*United States v. Tankersly,*
    537 F.3d 1100 (9th Cir. 2008).......................................................................13

*United States v. Tomko,*
    562 F.3d 558 (3d Cir. 2009) ............................................................................3

*United States v. Walters,*
 87 F.3d 663 (5th Cir. 1996) ................................................................14, 17

*United States v. Whitehead,*
 532 F.3d 991 (9th Cir. 2008) ..............................................................3, 20, 21

<u>STATUTES</u>

18 U.S.C. § 3553(a) ...........................................................................passim

U.S.G.G. § 1B1.3(a) .........................................................................11, 12

U.S.G.G. § 2B1.1 .........................................................................14, 17, 20

U.S.G.G. § 3B1.2(a) .................................................................................12

U.S.G.G. § 2B5.3 .....................................................................................20

U.S.G.G. § 2T3.1 .....................................................................................18

U.S.G.G. § 2T4.1 ................................................................................12, 18

U.S.G.G. § 5H1.6 .....................................................................................14

U.S.G.G. § 5K2.0 .....................................................................................14

# SENTENCING MEMORANDUM

## I.   Introduction and Background.

On May 18, 2009, Mr. Lam – a 49-year-old single dad and Vietnamese refugee – will come before this Court for sentencing after being convicted at trial on charges arising from a scheme to import and sell mislabeled Vietnamese catfish in order to avoid paying duties.  As set forth below, the defense respectfully requests that the Court both vary and depart downward from the advisory guideline range and impose a sentence of home confinement, which will permit Mr. Lam to continue to reside at home and care for and raise his 12-year-old son.  Such a sentence is "sufficient, but not greater than necessary," to fulfill the purposes of sentencing.  *See* 18 U.S.C. § 3553(a).

In light of the United States Supreme Court's decision in *Gall v. United States*, 128 S.Ct. 586, 596 (2007), it is clear that this Court has enormous discretion in determining the appropriate sentence for Mr. Lam, regardless of the specific sentence called for by the advisory guideline range.  *See United States v. Tomko*, 562 F.3d 558 (3d Cir. 2009) (en banc) (affirming district court's substantial variance to probation and home confinement because "a district court must be potentially able, when the proper situation arises, to sentence a defendant outside the Guidelines range but within the statutory range"); *United States v. Cavera*, 550 F.3d 180, 200 (2d Cir. 2008) (en banc) (noting that a court will "set aside a district court's substantive determination only in exceptional cases where the trial court's decision 'cannot be located within the range of permissible decisions'"); *United States v. Gardellini*, 545 F.3d 1089, 1095 (D.C. Cir. 2008) (affirming downward variance and noting that "it will be the unusual case when we reverse a district court sentence – whether within, above, or below the applicable Guidelines range – as substantively unreasonable"); *United States v. Whitehead*, 532 F.3d 991, 993 (9th Cir. 2008) (affirming sentence of probation where advisory guidelines called for 41-51 months of imprisonment and noting that Supreme Court's recent

1  sentencing decisions "breathe life into the authority of district court judges to

2  engage in individualized sentencing"); *United States v. Ruff*, 535 F.3d 999, 1004

3  (9th Cir. 2008) (affirming substantial downward variance to halfway house time

4  because, among other things, it permitted the defendant to spend more time with

5  his 11-year-old son).

6      Here, there is no statutory mandatory minimum sentence and no statutory

7  prohibition against imposing a sentence of probation. Accordingly, the statutory

8  range of available sentences is probation to twenty years in prison (each of the four

9  counts of conviction carries a maximum penalty of five years).

10     For the reasons set forth below, the defense respectfully submits that, based

11  on the factors set forth in 18 U.S.C. § 3553(a), a sentence of probation with a

12  condition that Mr. Lam serve twelve (12) months of home confinement is

13  appropriate in this case.

14  **II.    Objections and Corrections to the Presentence Report.**

15     The defense filed its objections and corrections to the Presentence Report

16  ("PSR") on May 4, 2009. These objections and corrections are hereby

17  incorporated by reference.

18  **III.   Mr. Lam's Position Regarding Sentencing.**

19     The defense submits that – pursuant to the factors set forth in 18 U.S.C. §

20  3553(a) – a sentence of probation and home confinement is sufficient, but not

21  greater than necessary, to achieve the purposes of sentencing.

22      **A.    Mr. Lam's Personal History and Characteristics.**

23     Mr. Lam grew up in Vietnam and was made a refugee as a result of the

24  Vietnam War. He has lived a hard life that has included persecution in his birth

25  country of Vietnam and immigration to the United States – a foreign country where

26  he did not speak the language – with only a sixth-grade education. He became a

27  naturalized United States citizen in 1991. He was married, but his ex-wife suffers

28

1  from                       and their marriage ended in divorce in 2005.  He has a
2  12-year-old son, whom Mr. Lam has cared for on his own for the past eight years.
3       Mr. Lam was born in Cho-Lon, Vietnam, a suburb of Saigon, Vietnam, in
4  1959.  Mr. Lam is the ninth of eleven children born to a poor, but loving, family.
5  Growing up, the Mr. Lam's family's basic economic needs were not met, and they
6  had just enough food to get by.  *See* PSR ¶ 80.  Mr. Lam left school by the time he
7  was 13 or 14 years old to help support his family.  Following the Communist
8  takeover of Vietnam, Mr. Lam was rounded up, with other Chinese-Vietnamese
9  young men, and placed in a forced labor camp that was guarded by armed men in a
10 jungle area unknown to him.  Mr. Lam escaped from the camp after a year, and
11 remained in hiding for fear of execution until he was able to leave Vietnam.  *See*
12 PSR ¶ 82.
13      Following one unsuccessful attempt, Mr. Lam finally escaped Vietnam by
14 boat in 1976, only to find himself in another guarded refugee camp in Malaysia.
15 *See* PSR ¶ 84.  After two and a half years in the Malaysian camp, Mr. Lam's
16 application for residence in the United States was accepted.
17      Mr. Lam's arrival in the United States, however, presented significant
18 difficulties, many of which persist today.  Mr. Lam's English was and is very
19 limited and he possesses only a sixth-grade education.  *See* PSR ¶ 105.  Despite the
20 language barrier and economic hardship, Mr. Lam never applied for welfare
21 benefits, and worked in various jobs across the United States before settling in San
22 Jose, California, in 1982.  *See* PSR ¶ 85.  Mr. Lam was married briefly to Chong
23 Su Xiu, a Chinese national whom he met and married while traveling to China in
24 1983.  She left him shortly after joining him in the United States.  *See* PSR ¶ 87.
25      In 1995, Mr. Lam married Ha Ngoc Nguyen in Vietnam; their son,
26      Lam was born in Vietnam in 1997.  Ms. Nguyen and            joined Mr.
27 Lam in San Jose in 1998.  *See* PSR ¶ 88.  Initially, the language barrier and general
28 unfamiliarity with the United States caused Ms. Nguyen to become

1

2          . *See* PSR ¶89.  This is confirmed by a social

3    worker.  (*See* Letter of Tuan D. Tran at Ex. 1 (

4

5    .

6          . . .

7

8

9          . *See* PSR ¶ 89.  (*See also* Letter of Tuan D. Tran at Ex. 1.)

10         The police became involved with the Mr. Lam and Ms. Nguyen's domestic

11   disputes on several occasions.  Following the incident with the        , Mr. Lam

12   called the police.

13                                                              PSR ¶ 89.

14   Ms. Nguyen accused Mr. Lam of abuse at that point; in the same year, Mr. Lam

15   pleaded no contest to a charge of misdemeanor battery on his spouse.  *See* PSR ¶

16   66.  In 2000, Mr. Lam was again arrested for a domestic dispute, but the case was

17   dismissed.  Mr. Lam has since completed a domestic violence class.  *See* PSR ¶ 66.

18         Several months after Ms. Nguyen returned from

19    .

20    .

21         . *See* PSR ¶ 18.  Mr. Lam was devastated, but he and

22   persevered.  Determined to start a new life with his son, Mr. Lam and

23   briefly moved in with his sister, Nu Lam, before finding their own home.  During

24   this time, Mr. Lam became depressed and began to drink alcohol to combat the

25   depression and his anxiety.  *See* PSR ¶ 101.  Mr. Lam has been better able to

26   control his drinking since 2002, but he still struggles to abstain from alcohol, and

27   feels that treatment would be very helpful.  *See* PSR ¶ 103.

28

---

1    In the first year or two

2         . In 2004, Mr. Lam and           moved to Virginia, and Mr. Lam and

3    Ms. Nguyen divorced in 2005.

4         Prior to their move to Virginia, Ms. Nguyen would visit           once every

5    six or seven months.  Since the move, she calls .           periodically and he visits

6    her on occasion; however,           always winds up staying with Mr. Lam's sister,

7    Pham Lam, in San Jose rather than with his mother.  *See* PSR ¶ 92.           is

8    afraid of his mother's "short temper" and "her arguments."  (*See* Letter of

9    Lam at Ex. 2.)

10

11

12

13

14

15

16

17

18

19       In Virginia, Mr. Lam has built a loving and healthy home for ,           Mr.

20   Lam and           live with one of Mr. Lam's friends, Kevin Duong, in Mr.

21   Duong's house.  *See* PSR ¶ 93.  Mr. Duong describes Mr. Lam as providing the

22   best possible care for           : Mr. Lam walks .           to and from school every

23   day, he helps him with his homework every night, and prepares healthy meals for

24   him.  (*See* Letter of Kevin L. Duong at Ex. 4.)           excels at school, is well-

25   mannered and polite, which Mr. Lam's friends attribute to his example and

26   guidance.  (Letter of Chi Duong at Ex. 6 (Mr. Lam as "righteous and shows

27   compassion for others, in which he has exposed and influenced .           . He highly

28   values education and ensures that .           gets his schoolwork completed before

1   any activity.").)  The consensus among the many friends who have written letters

2   on Mr. Lam's behalf is that separating .          from his father would have a

3   severely detrimental effect upon ⁻          (*See* Letter of Cam C. Duong at Ex. 7

4   (stating that          l's separation from his father "will greatly disrupt the

5   childhood of his son."); Letter of Yeon Ja Cho at Ex. 8 (explaining that she

6   understands "that his mother is in California and it would be a disaster if .

7   does not even have his father.").)

8           . also writes of the special, loving, and supporting relationship he has

9   with his father, and how his life would be turned upside down without him.  (*See*

10   Letter of ⌐       Lam at Ex. 2; Photograph of ⌐        and Peter Lam, at Ex. 9

11   (taken on        's twelfth birthday earlier this year).).  In addition, many other

12   individuals who know ⌐       have written letters to the Court on Mr. Lam's

13   behalf. (*See* Letters of Kevin T. Nguyen, Dominic John Bumbaca, Jr., Jimmy

14   Pham, Cindy Thi Dinh, and Tina P. Huynh at Exs. 10-14.).

15          **B.**    **Nature and Circumstances of the Offense.**

16                 **1.**    **Henry Nguyen's Role.**

17          Given that the Court presided over the three-week trial in this matter, the

18   defense will not rehash the evidence in this sentencing position paper.

19   Nevertheless, it is important to note – when determining Mr. Lam's sentence – that

20   the evidence at trial clearly established that it was Henry Nguyen – and not Mr.

21   Lam – who conceived of and executed the scheme to import mislabeled fish.

22   Furthermore, the evidence at trial clearly established that it was Mr. Nguyen – and

23   not Mr. Lam or the others working for Mr. Nguyen – who realized "profits" from

24   the scheme.  Mr. Nguyen owned and controlled the various companies regardless

25   of who was listed as president or sole shareholder.  Mr. Lam, like the other

26   individuals working at 9485 Silver King Court, was treated as a mere employee

27   regardless of his "official" position with Virginia Star Seafood Corporation

28   ("Virginia Star") or International Sea Products ("ISP").  Mr. Lam was paid a salary

1  of $4,000 a month and did not receive any commission, which was roughly
2  equivalent to what Theresa Luong (one of the government's primary witnesses)
3  was being paid, although Mr. Lam was provided with the added benefit of being
4  allowed to live in Mr. Nguyen's trailer with his son.

5      The evidence at trial established that Mr. Nguyen managed and controlled
6  several different entities. Using his father's companies, he arranged for the
7  importation of the mislabeled *Pangasius* fish through these entities (some of which
8  acted as importer and others of which acted as domestic sellers). Cynically and
9  more significantly, Mr. Nguyen set up the scheme so that the only company with
10  which his name was officially associated, Blue Ocean Seafood Corporation ("Blue
11  Ocean"), complied with the law by importing only properly labeled *Pangasius* and
12  paying the applicable duties on those imports. By contrast, the companies that
13  appeared to be owned and operated by his employees (Virginia Star, ISP, and
14  Silver Seas) imported mislabeled fish on which duties were not paid.

15      Similarly, on the Vietnamese side, Mr. Nguyen worked with his father's
16  company, Cafatex, to supply all of the properly labeled *Pangasius* to Blue Ocean,
17  while his father used purportedly different (but certainly related) exporters of the
18  mislabeled *Pangasius* (Anhaco, Antesco and Binh Dinh) to supply Virginia Star
19  and ISP.

20      There is little doubt that all of the *Pangasius*, whether properly labeled and
21  shipped to Blue Ocean, or mislabeled and shipped to Virginia Star or one of the
22  other entities, came from Cafatex. Indeed, emails introduced by the government at
23  trial showed that Mr. Nguyen (and only Mr. Nguyen) was corresponding with
24  Cafatex about what false names should be used for exporting the Pangasius. (*See*
25  Email at Ex. 15; PSR ¶¶ 23-24.)

26      From a financial perspective, Mr. Nguyen through his various companies
27  sold a significant amount of fish and apparently avoided paying a substantial
28  amount of duties. But, Mr. Lam's financial benefit from this operation was merely

1   his modest salary.  Ironically, Mr. Nguyen, who undoubtedly profited extensively

2   from this scheme, has managed to successfully avoid prosecution completely,

3   leaving his sales people to absorb the punishment.

4           **2.**     **Mr. Nguyen's Deception of Sophisticated Individuals.**

5         What is more, Mr. Nguyen successfully deceived a number of sophisticated

6   individuals about the type of fish that his companies were importing, including

7   Elizabeth Esparza, a reputable and experienced customs broker with Western

8   Overseas, and Jeff Cardin and Ed Rodgers, experienced managers of refrigeration

9   facilities.

10           **3.**     **Lack of Material Deception by Purchasers.**

11         It should be noted – when evaluating the nature and circumstances of the

12   offense – that the purchasers of the fish being sold by Mr. Lam were not deceived

13   in any material respect.  For the most part, the purchasers were looking for a white

14   fish that fried well and could stand up to the heat lamp on the buffet tables.  Many

15   of the purchasers who testified at trial said that they knew that the fish was

16   mislabeled or were satisfied with the product that was provided.  No purchaser

17   returned the product to Mr. Lam because he or she was unhappy with the quality.[2]

18        **C.**    **Advisory Guideline Range and Policy Statements.**

19         Although the Court must consider advisory Guidelines and applicable policy

20   statements as part of the Section 3553(a) analysis, the court cannot presume that

21   the Guidelines range constitutes a reasonable sentence.  *Gall v. United States*, 128

22   S.Ct. at 596-97.  *See* 18 U.S.C. § 3553(a)(4)-(5).

23   \\\

24   \\\

25   \\\

26

27   [2]     As discussed below, testimony at trial indicated that one of Mr. Yavelberg's customers
was unhappy with the product and it was returned.  Significantly, Mr. Yavelberg's client was not

28   part of the "Asian" fish market to which Mr. Lam was selling.

### 1.   Base Offense Level.

Mr. Lam's base offense level should be 22.  Based upon a Criminal History Category of I, Mr. Lam's advisory guideline range, before adjustments and departures, should be 41 to 51 months.

The defense's determination of a base offense level of 22 is premised on two primary factors:  (1) the applicable duty rate; and (2) the relevant conduct for which Mr. Lam should be held responsible. They are addressed in turn.

### a.   Duty Rate.

First, the applicable duty rate for the imported seafood at issue should be 45.55%, not 63.88%. All of the *Pangasius* imported from Vietnam came from Cafatex – the company owned by the father of Mr. Nguyen.  Mr. Nguyen's father created certain Cafatex-affiliated companies to export mislabeled fish to the United States and used those Cafatex-affiliated companies as the shipper of record. However, all of the shipments originated from Cafatex. *See* PSR ¶ 24.  Indeed, as noted above, Mr. Nguyen's corresponded with "Cafatex" about what fish species to use on the label.  (Email at Ex. 15.)  Thus, the duty that should apply to the Cafatex-affiliated companies is the same duty that applied to Cafatex.  The duty rate for Cafatex during the relevant time period was 45.55%, not 63.88%.  *See* Administrative Message 03-2235, U.S. Customs, July 24, 2003.

### b.   Relevant Conduct.

Second, the relevant conduct for which Mr. Lam should be held responsible should be limited to the mislabeled seafood that he actually sold.  This is the amount of loss that was reasonably foreseeable, pursuant to U.S.S.G. § 1B1.3(a). According to the PSR, the mislabeled seafood that Mr. Lam actually sold was worth approximately $2,900,000.  *See* PSR ¶ 36.

The PSR recognizes – and the testimony at trial confirms – that Mr. Nguyen, not Mr. Lam, owned and controlled all of the relevant business entities involved in the importation of mislabeled seafood. *See* PSR ¶¶ 23 and 28.  Mr. Lam's various

1 titles and "ownership" status in connection with Mr. Nguyen's companies was a

2 sham concocted by Mr. Nguyen.  Mr. Lam had no access to the financial

3 documents that would have shown the sales made by other individuals associated

4 with Mr. Nguyen's businesses (including Mr. Nguyen); he had no supervisory

5 authority or control over other individuals associated with Mr. Nguyen's

6 businesses (including Mr. Nguyen); he played little or no role in any aspect of Mr.

7 Nguyen's businesses other than domestic sales; he played no role in the

8 warehousing and transfer of the seafood imported and sold by Mr. Nguyen's

9 businesses; and he did not share in the profits of Mr. Nguyen's enterprise (in fact,

10 he was salaried and did not receive a commission on sales).

11      Thus, there is no basis to conclude that the total volume of sales by others

12 were reasonably foreseeable to Mr. Lam, such that Mr. Lam can be held

13 responsible under U.S.S.G. § 1B1.3(a).

14           **c.**    **Duty Rate Multiplied by Relevant Conduct.**

15      Assuming a duty rate of 45.55% and assuming relevant conduct of

16 $2,900,000, the duty owed – and tax loss – for purposes of determining a base

17 offense level would be approximately $1,300,000.  Thus, the correct base offense

18 level would be 22 (more than $1,000,000 and less than $2,500,000).  *See* U.S.S.G.

19 § 2T4.1(I).

20           **2.**    **Downward Adjustment for Minimal Role.**

21      Considering the scope and context of the overall scheme – a scheme

22 concocted by Mr. Nguyen in the United States and assisted by Mr. Nguyen's father

23 in Vietnam – Mr. Lam, as a mere employee and salesperson, is entitled to a four-

24 level downward adjustment for minimal role, pursuant to U.S.S.G. § 3B1.2(a).[3]

25

26 [3]     The defense submits that a substantial mitigating role adjustment is appropriate, regardless of the Court's determination as to Mr. Lam's base offense level.  However, a

27 substantial mitigating role adjustment is particularly appropriate if the Court determines that Mr. Lam's base offense level is 26 and holds Mr. Lam responsible for duties on the sales comprising

28 the entire conspiracy.

1    Mr. Lam, who speaks only broken English, was highly subservient to Mr.

2   Nguyen and lacked knowledge and understanding of the full scope and structure of

3   the enterprise and of the activities of Mr. Nguyen.  Mr. Lam played a minor role in

4   Mr. Nguyen's overall scheme – even if the analysis is confined to the mislabeled

5   seafood sold by Mr. Lam.  Mr. Lam was not involved in any of the farming,

6   labeling, or exportation of seafood from Vietnam.  Mr. Lam was not involved –

7   except, at the very most, minimally – in the importation of seafood into the United

8   States.  Mr. Lam had, at most, limited access to importation and financial records

9   of Virginia Star and ISP, and no access to the records of the other companies

10   owned by Mr. Nguyen.  Mr. Lam played no role whatsoever with the freezer

11   warehouses that held the seafood.  Mr. Lam did not personally profit from the

12   avoidance of any duties (like Mr. Nguyen did) – he received only a modest salary

13   for his sales and received no commission.  His title of president of Virginia Star

14   was a sham.  His "ownership" of ISP was a sham.  He was – in short – a low level

15   salesperson.

16    A four-level downward adjustment from a base offense level of 22 would

17   result in base offense level of 18 and an advisory guideline range 27-33 months.

18    **3.    Downward Departures.**

19    Regardless of how the Court determines Mr. Lam's base offense level and

20   regardless of whether the Court applies a downward role adjustment, the Court

21   should nevertheless depart downward below the advisory guideline range.[4]

22

23   _____

24   [4]    The bases for many downward departures are set forth in the various policy statements
contained in Parts H and K of Chapter 5 of the advisory guidelines.  *See* U.S.S.G. § 5, Parts H
and K.  The defense recognizes that, in the Ninth Circuit, the distinction between traditional

25   departures and variances is somewhat blurry.  *See United States v. Tankersly*, 537 F.3d 1100,
1114 & n.11 (9th Cir. 2008) ("The old departure scheme is relevant today only insofar as factors

26   that might have supported . . . a departure may tend to show that a non-guidelines sentence is
reasonable.").  To the extent that the Court declines to depart downward or to consider a

27   downward departure to be separate and apart from a downward variance, the grounds set forth
herein by the defense would also support downward variance.  *See, e.g., Menyweather*, 447 F.3d

28   at 663 (noting that even if the court erred in departing downward for family circumstances, error
(continued...)

1    First, the Court should depart downward based upon Mr. Lam's family

2  responsibilities.  Where a person is an "irreplaceable caretaker," family

3  responsibilities can be a basis for departing downward.  *See* U.S.S.G. § 5H1.6;

4  *United States v. Menyweather*, 447 F.3d 625, 632-33 (9th Cir. 2006); *United States*

5  *v. Leon*, 341 F.3d 928, 931 (9th Cir. 2003).

6    Second, the Court should depart downward based on the fact that the loss –

7  the duty owed on the importation of the seafood at issue here – overstates the

8  seriousness of the offense.  A court may depart downward, pursuant to U.S.S.G. §

9  2B1.1, comment. (n.19(C)), where the offense level "substantially overstates the

10  seriousness of the offense."  Such a downward departure is particularly appropriate

11  where, as here, Mr. Lam did not personally profit to a significant extent from the

12  activity. *See United States v. Walters,* 87 F.3d 663, 671 & n.8 (5th Cir. 1996)

13  (affirming district court's downward departure because reliance on loss table

14  overstated seriousness of offense where defendant received "no proceeds" from

15  crime).

16    Last, even if the Court finds that neither of these downward departures –

17  standing alone – apply to Mr. Lam's case, the combination of them surely supports

18  a downward departure.  A court may depart downward, based upon a combination

19  of factors, where the factors taken together make an exceptional case, each factor is

20  present to a substantial degree, and each factor is a permissible ground for

21  departure.  U.S.S.G. § 5K2.0(c).

22    **D.    Avoiding Unwarranted Disparities.**

23    In determining Mr. Lam's sentence, the Court must consider "the need to

24  avoid unwarranted sentencing disparities among defendants with similar records

25  who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).

26

27  (continued)
    was harmless because the court could have and would have granted downward variance for same
28  reason).

1    In *Gall*, the United States Supreme Court made clear that considering the

2  disparity between similarly situated co-defendants is appropriate at sentencing.

3  *Gall*, 128 S.Ct. at 600 (where district court "considered the need to avoid

4  unwarranted similarities among other co-conspirators who were not similarly

5  situated"); *see also United States v. Smart,* 518 F.3d 800, 804-05 (10th Cir. 2008)

6  (finding no procedural error in considering co-defendant disparity and affirming

7  variance where defendant's sentence was reduced so that it was not

8  disproportionate to the more culpable offender); *United States v. Presley*, 547 F.3d

9  625, 631 (6th Cir. 2008) (holding that sentencing court did not abuse its discretion

10  in considering co-defendant's sentence as justification for downward variance).

11    This Court has sentenced a number of other defendants who were involved

12  in the charged scheme to import and/or sell mislabeled *Pangasius*.  It is noteworthy

13  that, other than co-defendant David Wong, who had previously been convicted of a

14  similar offense involving the sale of mislabeled fish, every defendant received a

15  sentence of probation (some with a condition of home confinement).  Mr. Wong,

16  who had previously been convicted of selling mislabeled fish, received a sentence

17  of one year and a day.  Mr. Nguyen – who is a fugitive – has completely avoided

18  punishment by returning to Vietnam.[5]

19    Henry Yip and Wai Tai David Chu received probationary sentences despite

20  testimony at trial which was, at a minimum, evasive and, likely, untrue.  As the

21  Court was present for their testimony, it will undoubtedly draw its own

22  conclusions.  However, a few points bear mentioning.

23

24

---

[5]    Ironically, even if Mr. Nguyen were to return to the United States to face charges in this
25  matter, he likely would escape punishment because of this Court's ruling regarding the illegality
of the search warrant that produced the bulk of the evidence in this case.  While the Court found
26  that Mr. Lam and Mr. Yavelberg did not have standing, Mr. Nguyen, as the true owner of the
companies, definitely would have standing.  It is no wonder they seek such a harsh sentence
27  against Mr. Lam, since they undoubtedly will be unable to prosecute Mr. Nguyen.

28

1    As the Court may recall, Mr. Yip was so evasive in answering questions on

2   cross-examination that the Court, *sua sponte*, intervened on two occasions. (*See*

3   Transcript of Yip Cross Examination, at 35 and 37, at Ex. 16.)

4    As the Court may also recall, Mr. Chu's testimony on cross examination on

5   a number of points was simply not credible. This included the following:

6   • testifying that he did not know about duties on the *Basa* he purchased

7     when he had testified moments before on direct that he knew the *Basa*

8     had been imported illegally. (Transcript of Chu Cross Examination, at

9     158, at Ex. 17);

10   • testifying that he told the government agents during an interview that

11     Mr. Lam introduced Mr. Chu to Mr. Nguyen, which was inconsistent

12     with the agents' reports of the interviews. (Transcript of Chu Cross

13     Examination, at 166-67, at Ex. 17);

14   • falsely denying that he wrote the incriminating email to Mr. Nguyen

15     and then suggesting that the proposal made in the email actually

16     originated from Mr. Nguyen, and not from Mr. Chu (Transcript of

17     Chu Cross Examination, at 171-72, at Ex. 17; Email from Chu to

18     Nguyen at Ex. 18 ); and,

19   • testifying that he did not know that he could receive a motion for

20     substantial assistance from the government as a result of his

21     cooperation in the case. (Transcript of Chu Cross Examination, at

22     174-76, at Ex. 17.)

23    In fact, contrary to Mr. Chu's testimony, the email correspondence

24   demonstrates that Mr. Chu actually suggested to Mr. Nguyen very early on that

25   Mr. Nguyen could import the fish under a false name, thereby avoiding duties and

26   selling the fish to Mr. Chu at a cheaper price. (*See* Email from Chu to Nguyen at

27   Ex. 18.)

28

1    **E.      Reasons to Vary From the Sentencing Guidelines.**

2        A number of reasons support a substantial variance from the advisory

3    guidelines for Mr. Lam.  They are addressed in turn.

4            **1.      The Advisory Guidelines Vastly Overstate Mr. Lam's**

5                     **Individual Culpability in the Scheme.**

6        The advisory guideline range in this case – regardless of whether the Court

7    follows the defense's calculation or the government's calculation – is based largely

8    on the amount of taxes that were evaded as a result of the importation of the

9    mislabeled fish.  While this type of financial loss may serve as a proxy for

10   culpability, it is a very inexact one, particularly in cases like this where the

11   defendant did not personally profit from the activity.[6]

12       Based on a pure guideline analysis, Mr. Nguyen's and Mr. Lam's offense

13   level would be identical based on the amount of the evaded taxes or pecuniary

14   loss.[7]  The advisory guidelines themselves recognize that use of economic proxies,

15   like loss, can overstate the seriousness of the offense and can serve as a basis for a

16   downward departure.  U.S.S.G. § 2B1.1, comment. (n.19(c)); *see, e.g., United*

17   *States v. Walters,* 87 F.3d at 671 & n.8 (affirming district court's downward

18   departure because reliance on the loss table overstated the seriousness of the

19   offense because the defendant received "no proceeds" from the crime).

20       Given the lack of any commensurate gain or profit by Mr. Lam in proportion

21   to the *amount of taxes evaded or profits realized by Mr. Nguyen*, this Court should

22   "vary" from the advisory guideline range with regard to Mr. Lam.

23

24

25

26   [6]      This ground is analogous to the defense's request for a downward departure based upon
27   the fact that the loss overstates the seriousness of the offense.
     [7]      There would be a modest difference in the total offense level because Mr. Nguyen would
28   likely receive an upward adjustment for role in the offense pursuant to U.S.S.G. § 3B1.1.

### 2.   The Advisory Guidelines are Not Based on Any Empirical Data.

As a matter of policy, this Court should disregard, or at least place less reliance upon, the advisory guideline calculation because the advisory guidelines relied on by the PSR and the government are not based on empirical data from pre-guidelines cases.

In *Kimbrough v United States*, 128 S.Ct. 558, 565 (2007), the United States Supreme Court held that the district court did not abuse its discretion in varying from the crack guidelines because it disagreed with the range of punishment that those guidelines called for. In so doing, the Supreme Court noted that courts are free to "vary from the Guidelines based solely on policy considerations, including disagreements with the Guidelines." *Id.* at 570.

According to the Supreme Court, a district court's variance from the advisory guideline range, based on its conclusion that the advisory guidelines do not properly reflect the § 3553(a) factors in a particular case, might justify "closer review" where the advisory guideline range resulted from the Sentencing Commission's "exercise of its characteristic institutional role." *Id.* at 575. This role required the Sentencing Commission, in formulating the particular advisory guideline, to rely on two sources of information: (1) empirical evidence of pre-guidelines sentencing practice; and (2) judicial decisions, sentencing data, and commentary from practitioners and experts in the field. *Rita v. United States*, 551 U.S. 338, 127 S. Ct. 2456, 2464-65 (2007). Where the Sentencing Commission drafted an advisory guideline that failed to rely on such information, a sentencing court owes no special deference to that advisory guideline in determining a sufficient sentence under § 3553(a). *See Kimbrough*, 128 S.Ct. at 575 (holding that the crack guidelines did not "exemplify the Commission's exercise of its characteristic institutional role").

1    The PSR in this case relies on the tax guidelines set forth in U.S.S.G. §

2    2T3.1 (which cross-references the tax table in U.S.S.G. § 2T4.1). But, the tax

3    guidelines, as with the crack guidelines, do not "exemplify the Commission's

4    exercise of its characteristic institutional role." *Id.*. Rather, the Sentencing

5    Commission relied on skewed and incomplete data in setting the original guideline

6    ranges for tax offenses. Although the Sentencing Commission was supposed to

7    use an "empirical approach that use[d] data estimating the existing sentencing

8    system as a starting point" in developing the sentencing tables and ranges, the

9    Sentencing Commission, in formulating the guidelines for white-collar offenses,

10   only examined pre-guidelines cases that resulted in sentences of imprisonment.

11   *See* United States Sentencing Commission, *Supplementary Report on the Initial*

12   *Sentencing Guidelines and Policy Statements* (June 18, 1987) [hereinafter:

13   "*Supplementary Report*"] at 21-24 (demonstrating that the Sentencing Commission

14   excluded any consideration of probationary sentences in setting sentencing levels).

15   In tax cases, before the guidelines, only 30% of first-time offenders

16   convicted after trial in cases involving loss of $5,000 or less were sentenced to

17   prison. The Sentencing Commission's exclusion from the data of the 70% of first-

18   time offenders who did not receive prison sentences completely skewed the

19   resulting guideline ranges that were promulgated by the Sentencing Commission.

20   Indeed, the Sentencing Commission, itself, has recognized that with regard to

21   white-collar offenses, the Commission implemented sentences "significantly more

22   severe than past practice." United States Sentencing Commission, *Fifteen Years of*

23   *Guidelines Sentencing: An Assessment of How Well the Criminal Justice System is*

24   *Achieving the Goals of Sentencing Reform* 47 (2004) *available at*

25   http://www.ussc.gov/15_year/15year.htm.[8]

26

27   [8]    Although the PSR notes that there were potentially other offense levels applicable to the
     offenses of which Mr. Lam was convicted, the other offense levels also relate to "white collar"

28   crimes and suffer from the same problems as the advisory tax guidelines (only considering

(continued...)

1    Since the advisory guideline range in this case does not exemplify the

2    Sentencing Commission's "exercise of its characteristic institutional role,"

3    *Kimbrough*, 128 S.Ct. at 575, it is not entitled to any special deference by this

4    Court. Accordingly, the Court should not be concerned about varying from the

5    advisory guideline range in this case, particularly in light of the other bases for

6    varying set forth in this sentencing position paper.

7    ### 3.    Mr. Lam's Role as a Single Parent in Raising his Son.

8    Where an offender has young children, courts have considered this fact and

9    "varied" downward.[9] *See United States v. Whitehead*, 532 F.3d at 993; *United*

10   *States v. Ruff*, 535 F.3d at 1001. As noted above, even when the guidelines were

11   mandatory, the Ninth Circuit has recognized that a lesser sentence is appropriate

12   where, as here, a defendant is the sole caretaker of a child. *See United States v.*

13   *Menyweather*, 447 F.3d at 632-34.

14   Here, although Mr. Lam's son,          , could possibly be sent to live with

15   Mr. Lam's sister in California, there would be, at a minimum, a substantial

16   emotional price to be paid by          from losing the daily companionship and

17   love of his father, particularly when combined with the upheaval inherent in having

18   to move across the country, leaving all of his friends and trying to assimilate into a

19   new school where he does not know anybody.

20   ### 4.    The Crimes Here Did Not Pose the Same Danger to

21   ### the Community as Many other Crimes.

22   The Ninth Circuit, in *Whitehead*, specifically approved of a variance that

23   combined, among other things, family circumstances (an 8-year-old daughter who

24   depended on her father) and the fact that the defendant's crime "did not pose the

25   same danger to the community as many other crimes." *Whitehead*, 532 F.3d at

26   ---

27   (continued)
     defendants convicted at trial who were subject to imprisonment). *See e.g.*, *Supplementary Report* at 34 (Pre-Guidelines Lacey Act cases).

28   [9]    This is analogous to the downward departure discussed above.

993.  The crime in *Whitehead* involved the defendant's sale of over $1 million worth of counterfeit access cards that allowed his customers to view DirecTV's satellite feed, in violation of various copyright laws, from which the defendant earned over $400,000.  The applicable advisory guideline, U.S.S.G. §2B5.3, incorporates the loss table from U.S.S.G. § 2B1.1, which resulted in an offense level of 24 (based on an over $1,000,000 loss) before any other adjustments were applied.

Here, of course, Mr. Lam did not personally profit from the scheme in the same manner or to the same extent as the defendant in *Whitehead*.  More importantly, the type of crime committed by Mr. Lam did not pose the same kind of danger to the community as most other crimes.  There was no testimony that any purchaser of seafood from Mr. Lam was unhappy with the product received or tried to return it.  Indeed, throughout the entire case, despite the sales of over $10M of fish, there was only one customer who expressed any dissatisfaction with the product and returned it.[10]  As previously noted, many of the customers knew that they were receiving "Basa," and other customers did not care what kind of fish they were purchasing as long as it was white, fried well and stood up to the heat lamp on the buffet.  Thus, there was no serious injury to the customers or to the ultimate consumer.  Moreover, the activity at issue in the indictment ended four years ago.

Finally, in considering the "criminal activity" and the "danger" associated with it, it must be remembered that the "crime" here came about only because domestic catfish producers were upset because the Vietnamese product was of a higher quality and less expensive.  The domestic catfish producers lobbied the Department of Commerce and succeeded in having duties imposed on the Vietnamese *Pangasius* fish.

---

[10]   As previously noted, this involved a sale by Mr. Yavelberg, and likely resulted from the fact that Mr. Yavelberg's customer was not part of the "Asian market."

1    Thus, Mr. Lam's crime does not involve the same danger to the community

2  as most other crimes.  Indeed, it was even less serious than the one in *Whitehead*

3  because  there was no "theft" from another person or entity, there was no direct

4  economic loss to any third party (other than to the government that lost its ability

5  to collect protectionist tariffs), Mr. Lam did not conceive of or control the scheme,

6  Mr. Lam did not share in any of the profits from the scheme, and Mr. Lam was

7  paid only a modest salary.  Mr. Lam has demonstrated during the pendency of the

8  case and during sentencing that he poses absolutely no threat to the community as

9  he has been completely compliant with all of his conditions of pretrial release.

10            **5.      Mr. Lam's background as a Vietnamese refugee.**

11    Mr. Lam's personal history also supports a downward variance in this case.

12  As set forth above, Mr. Lam was imprisoned in a labor camp after the Communist

13  takeover of Vietnam when he was approximately fifteen years old.  After spending

14  a year there, he managed to escape but then remained in hiding for fear of

15  execution if he were discovered.  In 1976, Mr. Lam managed to escape Vietnam

16  but wound up in a guarded Malaysian refugee camp where he was forced to spend

17  over two years before he was finally accepted by the United States.  He came to

18  this country in approximately 1979 with a sixth-grade education, without being

19  able to speak the language, and with no means of support.

20    His difficult background and remarkable personal history is a mitigating

21  factor that supports a downward variance.

22            **6.      The Sentences Imposed on Other Defendants who**

23                 **Knowingly Sold Mislabeled Fish.**

24    As set above, this Court is authorized to consider the sentences imposed on

25  the co-defendants in this case and to vary downward on that basis.

26    Given that no co-defendant in this case has received anything close to the

27  kind of sentence suggested for Mr. Lam by the government, the PSR, and the

28  advisory guidelines, this also provides a strong basis for a downward variance.

1    The government will certainly point out that many of the co-defendants did
2  not traffic in the volume attributed to Mr. Lam; however, it should be noted that
3  many of those other defendants knew exactly what they were doing (selling
4  mislabeled fish) and, unlike Mr. Lam, they personally profited from doing so and
5  made substantially more money from it than Mr. Lam ever did.  We respectfully
6  submit that the individuals who ran their own companies and personally profited to
7  a much greater extent than Mr. Lam are substantially more culpable than Mr. Lam
8  and deserve greater punishment.  Mr. Lam was merely following Mr. Nguyen's
9  directions, paid a modest wage without any commissions or profit from the sale,
10  had no significant stake in the venture, and lacked the education, business
11  sophistication or acumen of many of the co-defendants.  Mr. Lam also did not have
12  a prior conviction for doing substantially the same thing.

13    **F.    Home Confinement Is Sufficient But Not Greater than**
14          **Necessary to Fulfill the Purposes of Sentencing.**

15    The Court, in sentencing Mr. Lam, is charged with ensuring that the ultimate
16  sentence is "sufficient, but not greater than necessary, to comply with the purposes
17  of sentencing set forth" in 18 U.S.C. § 3553(a)(2)(A)-(D).

18          **1.    Seriousness of Offense, Respect for Law, Just**
19                **Punishment.**

20    A felony conviction and a sentence of home confinement followed by a
21  lengthy term of probation reflects the seriousness of Mr. Lam's offense, promotes
22  respect for the law, and provides just punishment.

23    As previously noted, the instant offense did not involve any physical harm,
24  any economic harm to any third party (other than the government's loss of
25  protectionist tariffs), or personal gain by  Mr. Lam.  Also, as the United States
26  Supreme Court noted in *Gall*, a sentence of probation is not an "act of leniency,"
27  but rather a "substantial restriction of freedom."  *Gall*, 128 S. Ct. at 593.

28

1   Here, the sentence would not merely be probation but would include a

2   lengthy term of home confinement.  Under the unique facts of this case, a sentence

3   of home confinement is sufficient to reflect the seriousness of the offense, to

4   encourage respect for the law and to provide just punishment.

### 2.      Deterrence.

6   A sentence of probation which includes home confinement will provide

7   sufficient deterrence.  With respect to specific deterrence, a sentence of

8   imprisonment is not necessary.

9   Mr. Lam is 49 years old, and except for his domestic problems, is a first-

10  time offender who has lived a law-abiding life.  There is every reason to believe

11  that this conviction will be more than sufficient "deterrence" for Mr. Lam and that

12  he will never again violate the law.  With respect to general deterrence, the

13  government's aggressive prosecution of individuals like Mr. Lam resulting in a

14  felony conviction and home confinement should be more than sufficient.  There is

15  no reason why "general deterrence" justifies a greater sentence for Mr. Lam than it

16  did for any of the co-defendants.

### 3.      Protection of Public.

18  Mr. Lam is not a danger to the public.  He is 49 years old and has no

19  significant criminal history.  As previously noted, he has been convicted for

20  conduct that did not involve any physical injury, economic loss (other than the

21  duties), vulnerable victims or predatory behavior (as is present in many fraud

22  schemes).  Mr. Lam has successfully complied with the terms and conditions of his

23  pretrial release for the last two years.  Last, the charges in the indictment are four

24  years old and there are no allegations that Mr. Lam is currently involved in the

25  importation of mislabeled seafood.

### 4.      Correctional Treatment.

27  Mr. Lam might benefit from correctional treatment, such as educational and

28  vocational training, as well as substance abuse treatment.  But, his need for these

1 | services is not a justification for putting him in prison; they could be provided
2 | much more efficiently and inexpensively as a condition of probation.

3 | **IV.    Conclusion.**

4 |         For the reasons set forth herein, the defense respectfully requests that Mr.
5 | Lam be sentenced to a lengthy period of probation with a condition that he spend
6 | twelve (12) months in home confinement.

Respectfully submitted:

DATED:  May 11, 2009          CROWELL & MORING LLP


By: _____/s/_____
              Jeffrey H. Rutherford

COZEN O'CONNOR


By: _____/s/_____
              L. Barrett Boss (*pro hac vice*)

Attorneys for Defendant Peter X. Lam

## PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES,

I am employed in the County of Los Angeles, State of California, at Crowell & Moring at 800 Wilshire Boulevard, Suite 500, Los Angeles, California 90017. I am over the age of 18 and not a party to the within action.

On **May 11, 2009**, I served the foregoing document described as **Defendant Peter X. Lam's Redacted Position Regarding Sentencing; Redacted Exhibits 1 - 18** on the parties in this action by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies the following:

Judith Wheat
Adam Zaffos
Thomas A. Durkin
Nina Marino
Barbara B. Nguyen
Roger William Patton
Elinor Colbourn
Joseph Johns

In addition to the above, the following were served as follows:

Laurene Harding, United States Probation Office
312 N. Spring Street, Room 600
Los Angeles, California 90012
Phone (213) 894-3600/ Fax (213) 894-3627

☑      **(BY FACSIMILE)**

Said document was transmitted by facsimile machine to the address(es) on the service list at the facsimile numbers listed therein. I am readily familiar with my firm's practice for transmissions by facsimile. Said transmissions are sent as soon as possible and are repeated, if necessary, until they are reported as complete and without error. In sending said document by facsimile, I followed the firm's ordinary business practices. The original fax transmission confirmation report of said transmissions are attached hereto.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on **May 11, 2009**, at Los Angeles, California.

_____/s/_____
D. Garlow

DEFENDANT PETER X. LAM'S REDACTED POSITION REGARDING SENTENCING